UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAGDA FELIX NEGRON,                     )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )   Case No. 20-cv-30055-KAR
                                        )
KILOLO KIJAKAZI,[1]                     )
Acting Commissioner of Social           )
Security Administration,                )
                                        )
        Defendant.                      )


MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR ORDER
REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S MOTION TO
AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 20 & 23)

ROBERTSON, U.S.M.J.

I.      Introduction and Procedural History

This action seeks review of a final decision of the Acting Commissioner of Social

Security ("Commissioner") denying the application of Plaintiff Magda Felix Negron ("Plaintiff")

for Supplemental Security Income ("SSI").  Plaintiff applied for SSI on February 10, 2017,

alleging disability based on chronic asthma, swelling in hands and feet, bone pains, and joint

pains, with a November 1, 2016, onset of disability (A.R. 200, 204).[2]  The application was

denied initially and on reconsideration (A.R. 79, 91).  After a July 26, 2018, hearing, the

Administrative Law Judge ("ALJ") found that Plaintiff was not disabled and denied her claim

---

[1] On July 9, 2021, Kilolo Kijakazi was appointed as Acting Commissioner of the Social Security
Administration by President Joseph R. Biden.  Under Federal Rule of Civil Procedure 25(d), she
is automatically substituted as the defendant in this case.

[2] A copy of the Social Security Administration administrative record ("A.R.") has been filed with
the court under seal (Dkt. No. 14).  Citations to the A.R. page numbers are to the numbers
assigned by the agency, which appear in lower right-hand corner of the page.

(A.R. 21-35).  The Appeals Council denied review (A.R. 1-5), and, thus, the ALJ's decision became the final decision of the Commissioner.  This appeal followed.

Plaintiff seeks reversal of the Commissioner's denial of her claim on the grounds that the ALJ erred by: (1) failing to assign appropriate weight to opinion evidence from Plaintiff's treating care providers and to records related to state-funded personal care assistance she received to perform her activities of daily living; and (2) failing to consider the side effects of medication (Dkt. No. 20-1 at 1).  The Commissioner has moved to affirm on the grounds that the ALJ's decision is legally sound and supported by substantial evidence (Dkt. No. 23).  Pending before this court are Plaintiff's Motion for Order Reversing the Commissioner's Decision (Dkt. No. 20) and the Commissioner's Motion to Affirm the Commissioner's Decision (Dkt. No. 23). The parties have consented to this court's jurisdiction (Dkt. No. 16).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court will grant Plaintiff's motion and deny the Commissioner's motion.

     II.    Legal Standards

        A.  Entitlement to SSI

To qualify for SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.  A claimant is disabled for purposes of SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy,

regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute. *See* 20 C.F.R. § 416.920. The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience. *See* 20 C.F.R. § 416.920(a)(4). *See also Goodermote v. Sec'y of Health & Human Servs.,* 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 416.920(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work. *See* 20 C.F.R. § 416.920(e). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996). "Work-related mental activities generally . . . include the abilities to: understand, carry out, and remember

instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id*. at *6.

The claimant has the burden of proof through step four of the analysis. At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

B.  Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. 42 U.S.C. § 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo* but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id*. (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir.1999) (per curiam)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw

4

conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial

evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably

could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore

evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

III.   Relevant Facts

A.   Background

 Plaintiff was 28 when she filed her SSI application (A.R. 71). She graduated from high

school in Puerto Rico and earned a diploma from a cosmetology institute in 2007 (A.R. 47-48).

She was employed in Puerto Rico as a personal care assistant and in a school dining hall (A.R.

48-49). After coming to the United States, she briefly worked in a poultry processing plant (A.R.

48). In 2015 she earned $13,785 as a self-employed hair stylist (A.R. at 50-52).

B.   Medical Records Relevant to Plaintiff's Claim

Plaintiff established care with Caring Health Center on or around March 15, 2016 (A.R.

650). She was oriented to person, place, and time, with a normal mood and affect, normal

behavior, and normal judgment and thought content (A.R. 652). She was diagnosed with mild

intermittent asthma without complications. She did not report joint or muscle pain (A.R. 652-

53). At an April 4, 2016, visit scheduled for purposes of a complete physical examination,

Plaintiff reported an increase in left-sided low back pain. On examination, she had a decreased

range of motion, tenderness, pain, and spasm without sciatica. She was referred to physical

therapy (A.R. 647-48). On October 10, 2016, Plaintiff returned to the practice with a complaint

of back pain along with foot and hand pain. She reported that physical therapy had worsened her

symptoms and caused her hands and legs to swell. She still had pain (A.R. 640). On

examination, she exhibited a decreased range of motion in her lumbar back with tenderness,

pain, and spasm (A.R. 641).  Amanda Galloway, PA-C, diagnosed acute midline back pain without sciatica.  The plan was to refer Plaintiff to pain management (A.R. 642).  On or around November 9, 2016, Plaintiff was diagnosed with obstructive sleep apnea and prescribed a CPAP device (A.R. 277).

On December 21, 2016, Plaintiff had a new patient visit with Victoria Peters, D.O., at Primary Care Associates, LLC (A.R. 292).  She was observed to have a normal gait.  Her spine was normal with no tenderness or muscle spasms.  She had no decreased range of motion.  A decrease in salt intake was recommended for joint swelling (A.R. 292-93).  She was noted to be morbidly obese.  She was diagnosed with moderate persistent asthma, chronic sinusitis, mild depression, and a generalized anxiety disorder (A.R. 293).  She returned for a follow-up visit on January 20, 2017, complaining about swelling in her lower extremities, bilateral hand swelling and paresthesia, and numbness and tingling in both hands (A.R. 289-90).  Her hands and feet were swollen.  The test for Tinel's sign and Phalen's test were positive.  Plaintiff was diagnosed with carpal tunnel syndrome and edema of the legs along with moderate persistent asthma.  She was provided with wrist splints and compression stockings were mailed to her (A.R. 290).

At a February 22, 2017, office visit conducted under the supervision of Dr. Peters, Plaintiff complained about multiple joint pain for years.  The care provider noted a possible diagnosis of fibromyalgia and prescribed a trial of gabapentin.  Major problems noted included moderate persistent asthma, chronic sinusitis, mild depression, generalized anxiety disorder, and obstructive sleep apnea.  Plaintiff had missed her ENT appointment and been terminated by the ENT practice as a patient (A.R. 352-53).

In or around March 2017, Plaintiff established a treating relationship with pulmonologist Victor Pinto-Plata, M.D. (A.R. 317).  Plaintiff reported persistent moderate asthma with 2 to 3

exacerbations annually that required emergency room visits but had not resulted in intubation or ICU hospitalization.  Her symptoms had gotten worse (A.R. 317-18).  Her pulmonary function tests showed a mild restriction.  In Dr. Pinto-Plata's opinion, Plaintiff's symptoms had worsened because of co-morbidities, including morbid obesity, sleep apnea, large tonsils, and chronic sinusitis, which made her asthma symptoms uncontrolled and difficult to manage (A.R. 317-18).

On or around March 23, 2017, Plaintiff applied for mental health treatment with Sunrise BHC.  She reported during the intake interview that she had depressive symptoms that interfered with her daily activities and that she could not work because of her medical conditions (A.R. 497-98).  She reported suffering constant pain (A.R. 500).  Plaintiff was observed to be nervous, preoccupied, and depressed.  Her perceptions, thought content, orientation, and judgment were assessed as being within normal limits (A.R. 500).  Other than church involvement, the form identified no social supports or activities in which she engaged (A.R. 502).  Therapist Hansel Pantojas-Perez recommended weekly therapy sessions to decrease Plaintiff's depression (A.R. 505).

On April 26, 2017, Plaintiff returned to Dr. Pinto-Plata because of worsening asthma symptoms (A.R. 433).  The doctor's findings were that Plaintiff had severe asthma symptoms but relatively preserved lung function.  He observed that her chronic sinusitis and obesity made it more difficult to control her asthma (A.R. 434).

Plaintiff had an office visit with an advanced registered practice nurse ("APRN") at Primary Care Associates on May 23, 2017.  She complained about bilateral hand swelling, pain in all digits, and leg swelling.  She was wearing compression stockings and had no edema.  Plaintiff reported that she had pain in multiple joints that interfered with her activities of daily living and that gabapentin was not helping.  Plaintiff continued to experience bilateral hand

swelling, pain, and numbness in all her digits.  The splint for carpal tunnel syndrome caused an increase in swelling.  Plaintiff was willing to try physical therapy and electromyography to ascertain whether she had carpal tunnel syndrome (A.R. 355).  On examination, Plaintiff's gait was normal, and she was oriented in time, place, person, and situation.  She was assessed as having bilateral carpal tunnel syndrome, moderate persistent asthma, chronic tonsillitis, and pain in multiple joints.  Plaintiff had failed to attend multiple appointments with specialists and was therefore discharged as a patient from the practice (A.R. 356).

Plaintiff returned to Primary Care Associates on June 22, 2017.  She was reminded that she had been discharged as a patient.  She was nonetheless seen by the same APRN, who identified Plaintiff's major problems as moderate persistent asthma, seasonal nasal allergies, chronic sinusitis, mild depression, generalized anxiety disorder, obstructive sleep apnea, and bilateral carpal tunnel syndrome.  Plaintiff complained of swelling and discomfort in her legs and daily muscle weakness and pain and said that sometimes she could not get out of bed. Gabapentin was not helping for her fibromyalgia symptoms (A.R. 358).  On examination, Plaintiff's gait was normal, she had trace edema in both lower extremities, and diffuse tenderness in one lower extremity.  She was oriented to time, place, person, and situation, and her judgment, insight, and affect were normal.  She was assessed as suffering from moderate persistent asthma, chronic sinusitis, bilateral carpal tunnel syndrome, mild depression, edema and pain of the lower leg, and fibromyalgia.  Plaintiff was informed that she would need to find a new PCP before she could proceed with treatment by an ENT (A.R. 358-59).

Plaintiff attended some thirteen physical therapy sessions at Team Rehab and Wellness between June 9 and August 28, 2017.  She was referred for muscle weakness, unspecified abnormalities of gait, lower back pain, fibromyalgia, impaired mobility, and difficulty with her

activities of daily living because of pain and weakness and bilateral carpal tunnel syndrome
(A.R. 362).  Physical therapists noted chronic pain from fibromyalgia and limited range of
motion in her lumbar region.  She had difficulty walking, bending, and standing, and with
activities of daily living (A.R. 397-98).  Her lumbar range of motion was limited to 50% due to
pain (A.R. 399).  She was discharged on August 28, 2017, having made little progress towards
improving her functional activity tolerance and abilities (A.R. 399).

On June 19, 2017, when Plaintiff returned to Dr. Pinto-Plata, he observed that chronic
rhinitis and sleep apnea were contributing to the poor control of her moderate persistent asthma.
She was not wheezing in the office but had some degree of difficulty breathing.  The doctor
ordered allergy testing and chose not to alter Plaintiff's medications.  He recommended that she
get in touch with the Sleep Medicine physicians because he suspected that her fatigue was due to
sleep apnea that had not been addressed (A.R. 436).  Plaintiff met with Mary Jo Farmer, M.D., at
the Wesson Sleep Clinic on July 10, 2017 (A.R. 407).  Problems noted included obstructive sleep
apnea, asthma, morbid obesity, and sacroiliac disorder (A.R. 407-08).  Plaintiff's allergy testing
was negative.  Plaintiff brought the results of her prior sleep study, which confirmed obstructive
sleep apnea.  She reported that she had a CPAP device but using it made her throat sore and dry.
She was interested in trying the CPAP machine again (A.R. 410).  On July 24, 2017, when
Plaintiff returned to the sleep clinic, she brought her CPAP device.  Downloaded data showed
little use.  Plaintiff was fitted with a new mask and directed to follow up with her ENT (A.R.
417).  Plaintiff also returned to Dr. Pinto-Plata in July 2017, reporting that she continued to feel
short of breath with physical exertion.  The doctor, who noted persistent asthma, added an
inhaler to her existing treatment regimen, and recommended that she continue therapy for sleep
apnea (A.R. 438).

On July 28, 2017, Plaintiff returned to Caring Health Center for primary care, seeing physician's assistant Amanda Galloway (A.R. 637).  Ms. Galloway recorded a primary diagnosis of fibromyalgia (637, 639).  Plaintiff reported that gabapentin was not helping her pain and she asked for something else.  Plaintiff also suffered from chronic nasal congestion and obstructive sleep apnea and was being treated for asthma by a pulmonologist.  She exhibited shortness of breath and wheezing, and reported back pain, falls, joint pain, myalgias, and neck pain (A.R. 637).  On examination, Ms. Galloway noted a normal range of motion and normal coordination (A.R. 638).  Ms. Galloway substituted Duloxetine for Gabapentin and provided Plaintiff with an ENT referral for treatment of obstructive sleep apnea and chronic nasal congestion (A.R. 639).

Plaintiff returned to Jerry Schreiberstein, M.D., on August 25, 2017, for treatment of her sleep apnea (A.R. 462).  Dr. Schreiberstein diagnosed a left septal deviation and turbinate hypertrophy, recommended septoplasty, and explained the risks and benefits (A.R. 466-67). Plaintiff requested a second opinion and was examined by Robert W. Eppsteiner, M.D., on September 28, 2017 (A.R. 468).  Dr. Eppsteiner's examination confirmed Dr. Schreiberstein's findings; he recommended, however, that Plaintiff undergo UPPP surgery first to remove excess tissue from her throat and increase the airway (A.R. 470-71).  When Plaintiff's insurance company denied coverage for the UPPP surgery because of poorly documented CPAP use, Dr. Eppsteiner recommended proceeding with the septoplasty (A.R. 474), which was performed on November 15, 2017 (A.R. 476).

By October 10, 2017, Plaintiff had moved to Riverbend Medical Group for primary care because she had missed appointments with her previous PCP.  She was seen initially by Hyun-Young Park, M.D., who noted that she had a history of fibromyalgia.  On examination, she had pain in multiple joints (A.R. 616-17).  Dr. Park recorded a history of fibromyalgia, benign

hypertension, anxiety, asthma, and sleep apnea, noted that Celeste Enriquez, M.D., would be Plaintiff's primary care physician, and referred Plaintiff to physical therapy and rheumatology for care (A.R. 617-19).

During an October 31, 2017, consultation with rheumatologist James R. Schumacher, M.D., Plaintiff complained about widespread pain and hand and foot numbness as well as disturbed sleep and fatigue (A.R. 332-33, 336). Dr. Schumacher noted mild to moderate tenderness to digital palpation at the occiput, trapezius, second rib, lateral epicondyle, knees, greater trochanter, and gluteal areas bilaterally. For the most part, Plaintiff had a full range of motion in her joints, including hands, feet, wrists, ankles, and knees, with mild pain at the extremes of the normal range of motion in a number of joints. She was able to make a full fist and had a good grip strength. Her gait was normal. Dr. Schumacher diagnosed pain at multiple sites, fibromyalgia, obstructive sleep apnea, and numbness, although he planned to order nerve conduction studies to rule out carpal tunnel syndrome (A.R. 335-36).

Dr. Enriquez saw Plaintiff for the first time on November 7, 2017. Plaintiff presented with moderate persistent asthma with acute exacerbation because she had run out of medication, fibromyalgia, obstructive sleep apnea, benign hypertension, morbid obesity, and nasal turbinate hypertrophy. Plaintiff reported chronic pain from fibromyalgia and said that she needed assistance with activities of daily living (A.R. 608-10). Dr. Enriquez renewed Plaintiff's prescriptions for her asthma and deferred a plan for treating her fibromyalgia until after her septoplasty. Dr. Enriquez told Plaintiff she did not personally approve personal case assistant services but would ask for an evaluation of such services for Plaintiff at least for household chores (A.R. 610-11).

At a November 21, 2017, post-operative visit, Plaintiff reported that she was doing well. She was having some occasional imbalance and was seeing Dr. Enriquez later that day to discuss this problem (A.R. 476). Dr. Enriquez noted during the November 21, 2017, appointment that Plaintiff reported pain in multiple joints and requested pain medication (A.R. 344). Plaintiff had a form for personal care assistance services to help with household chores and transportation that she asked Dr. Enriquez to fill out. Dr. Enriquez indicated that she would sign the form (A.R. 345). Following examination, Dr. Enriquez recorded her impression that Plaintiff was suffering from fibromyalgia, anxiety, and fatigue, unspecified type, which Dr. Enriquez suspected was from inadequately treated obstructive sleep apnea. Dr. Enriquez noted that she would ask Plaintiff's therapist to refer Plaintiff to someone who could prescribe medication to address Plaintiff's anxiety. She talked about approaches to weight loss with Plaintiff (A.R. 347).

Plaintiff returned to Dr. Eppsteiner on December 18, 2017, for further follow up after the septoplasty. She reported improvement in her breathing but said she was still suffering from obstructive sleep apnea and a sore throat. Dr. Eppsteiner recommended trying a nasal mask for her CPAP device and planned to recommend her for a fitting (A.R. 481). Plaintiff had an appointment with her pulmonologist the next day. She reported to Dr. Pinto-Plata that her asthma was under relatively better control. She was using her medication appropriately and had had no hospitalizations or asthma exacerbations over the last six months (A.R. 439).

On January 18, 2018, Plaintiff presented at Riverbend for an annual physical examination accompanied by a personal care assistant. She reported that her chronic medical issues were at baseline. She requested a transfer of her pulmonology and rheumatology services to Riverbend. Plaintiff reported ongoing dyspnea (shortness of breath) on exertion, leg swelling, and all over body pain from fibromyalgia for which she was not taking medication (A.R. 329). On January

29, 2018, Plaintiff was seen by physician's assistant David Ott.  Her chief complaint was that she had numbness and tingling in her feet and had fallen frequently over the last few weeks.  Mr. Ott's impression was that Plaintiff was suffering from peripheral edema that might be caused by low potassium levels (A.R. 326-28).

Plaintiff met with Edgardo Rodriguez, M.D., for an initial mental health medication consultation on February 15, 2018.  She reported feeling depressed, worthless, hopeless, anxious, and at times irritable because of her multiple medical conditions and financial difficulties.  Dr. Rodriguez noted that Plaintiff's mood and affect were anxious and depressed.  She was cooperative, fully oriented, and her insight, judgment, concentration, and attention were good. He diagnosed major depressive disorder, recurrent and moderate, and an unspecified anxiety disorder.  He prescribed duloxetine and trazodone (A.R. 487).

A week later, Plaintiff returned to Dr. Schumacher for further evaluation of her fibromyalgia (A.R. 583).  She was accompanied by a personal care assistant.  She again described widespread pain involving her neck, shoulders, lower back, hips, knees, hands, and feet, and paresthesia in her hands and feet (A.R. 584).  After an examination, the results of which were similar to the results of his prior examination, Dr. Schumacher reaffirmed that Plaintiff had many tender points and her condition looked like fibromyalgia.  He noted that she was taking Cymbalta and medication for anxiety and was using a walker at times.  Plaintiff told Dr. Schumacher that gabapentin had helped her in the past, so he prescribed gabapentin.  He noted that Plaintiff appeared to be less physically active than she had been and that she "ha[d] much deconditioning."  At Plaintiff's request, he ordered her a walker (A.R. 587).

On March 12, 2018, Plaintiff had an initial visit with family nurse practitioner Adele Hill from the pulmonology group at Riverbend (A.R. 579, 583).  Plaintiff's chief complaint in this

context remained sleep apnea and much of the visit was focused on Plaintiff's use of the CPAP

device.  When Plaintiff used the device, she did not snore or experience apneas, but she

continued to have dryness in her throat (A.R. 580).  Ms. Hill diagnosed Plaintiff with severe

obstructive sleep apnea and discussed CPAP therapy with Plaintiff (A.R. 582).  On March 14,

2018, when Plaintiff returned to Dr. Eppsteiner's practice, the findings on examination were

consistent with those at the previous examination.  The recommendation was that she continue

using a CPAP device, but with a nasal pillow mask, and she was told that Dr. Eppsteiner's

practice would help her if she had a problem obtaining one (A.R. 479, 484).

Plaintiff returned to Dr. Rodriguez's office on March 20, 2018 (A.R. 495).  She reported

that she continued to feel depressed, worthless, and frustrated.  She was barely using her

medications (A.R. 490).  By means of a check mark form, Dr. Rodriguez indicated that

Plaintiff's speech and thought processes were normal, coherent, and appropriate, that she had no

abnormal thoughts or hallucinations, her attention and concentration were intact, she was fully

oriented, and her memory was intact.  Plaintiff's mood and affect were sad, and her judgment

and insight were mildly impaired (A.R. 492-93).  Dr. Rodriguez maintained his diagnosis of

moderate major depressive disorder and unspecified anxiety disorder (A.R. 494).  He renewed

Plaintiff's prescription for duloxetine and discontinued the trazadone (A.R. 494).

On April 24, 2018, Plaintiff was seen by physician's assistant Jennifer Alix for a

complaint about chronic and worsening back pain.  She reported taking ibuprofen for pain and

that she had previously had spinal injections.  She wanted to avoid strong pain medication

because of concerns that such medication would worsen her sleep apnea (A.R. 552).  A recent

lumbar x-ray was normal (A.R. 552).  After an examination, Plaintiff was encouraged to walk,

do back exercises that had been provided, and return to daily activities as soon as possible.  She

was advised to seek medical attention if she experienced numbness or weakness in the legs, problems with bowel or bladder control, or fever, and was referred to physiatry (A.R. 555-56). Plaintiff returned for an appointment with Dr. Enriquez on May 15, 2018, at which time her chief complaints were back and leg pain.  She was falling frequently because of lower back pain and bilateral foot numbness.  She said she felt as though she was walking off balance and asked for a cane (A.R. 546).  Over-the-counter pain medication and low-dose gabapentin had not been helpful in pain relief (A.R. 547).  Plaintiff's gait appeared normal in the office.  Dr. Enriquez questioned whether Plaintiff might be experiencing neuropathy.  Dr. Enriquez increased Plaintiff's gabapentin dosage and ordered a spinal MRI in advance of a physiatry appointment (A.R. 551).

Plaintiff was seen by Adele Hill, a family practice nurse with Riverbend's pulmonology group on June 14, 2018, for her severe obstructive sleep apnea (A.R. 542).  Plaintiff reported that she used her CPAP machine six hours a night, seven nights a week.  The machine was effective when she used it, but the humidifier ran out of water fast.  She was getting frequent throat infections (A.R. 543).  Ms. Hill confirmed that the CPAP machine was medically necessary and emphasized the benefits of its use.  She discussed weight management options with Plaintiff, who indicated an interest in surgery (545).

C.  Function Report

Plaintiff (or someone on her behalf) completed a function report on March 22, 2017 (A.R. 218), in which Plaintiff reported that she lived with and cared for her three young daughters, including cooking meals, cleaning the apartment, and doing laundry when she was not limited by pain (A.R. 213-17).  She went to church three days a week (A.R. 215).  Her medical

condition affected her ability to, among other things, lift, stand, walk, sit, bend, climb stairs, and use her hands (A.R. 216).

    D.  <u>Hearing Testimony</u>

Plaintiff and vocational expert Michael Dorval ("V.E.") testified at the July 26, 2018, administrative hearing (A.R. 42-70).

Plaintiff testified that she stopped working because her pain got worse and worse (A.R. 50). She could not be on her feet much because her feet would swell up and her back and legs would hurt. Her arms would go numb, and she had a lot of pain in her shoulders and neck (A.R. 52-53). She had neuropathy in her legs that caused her to lose her balance and fall (A.R. 53). She did not sleep well and was sometimes very, very tired (A.R. 53). She took medication for her pain, which was only helping a little bit. Her doctors had recently raised the dose (A.R. 54). She also had pulmonary issues that affected her a lot. She could not walk much without feeling as though she was choking. She had to take it very slow when she engaged in any activity and climbing steps was hard (A.R. 55). She had had asthma since she was a child. Heat and walking made her choke. She used two pumps and a pill for her asthma and had a vaporizer in her home (A.R. 56-57). She had to sleep propped up and using a CPAP machine. The machine helped her sleep, but she woke up many times in the night and had to add water to the machine (A.R. 55-56).

As to daily activities, by the date of the hearing, Plaintiff was receiving personal care assistance to perform most, if not all, of her activities of daily living. Personal care assistants cleaned the house, shopped for groceries, cooked, helped Plaintiff bathe herself, and did laundry (A.R. 57-58). Plaintiff said she did not think she could drive because she needed to be accompanied by a personal care assistant at all times (A.R. 61). She took all her medication the

way she was supposed to without side effects except for dizziness caused by an anxiety medication (A.R. 58).  She continued to attend church around four times a week but had limited ability to participate in church activities because of her medical conditions (A.R. 60).

Asked about her mental health impairments, Plaintiff testified that she was depressed because she could not engage in activities with her daughters.  She got anxious when she tried to "do things," and she could not be with very many people (A.R. 58-59).

When the V.E. testified, the ALJ asked him to assume a hypothetical individual with Plaintiff's personal characteristics, including physical and mental impairments, who did not read or write in English and who had minimal ability to communicate in the language (A.R. 64-65). The ALJ limited this individual to work at a light exertional level which would require no more than the occasional need to bend, twist, or crouch, and that could be performed indoors with no concentrated exposure to dust, fumes, strong odors, temperature, or humidity extremes.  He added seizure precautions, such that the job should not require work at heights or around moving machinery (A.R. 65).  The ALJ then asked if this individual could perform any of Plaintiff's past work.  The V.E. responded that the person could work as a hairdresser (A.R. 65).

Asked to assume that the person would need to sit up to half of the time while remaining on task, the V.E. said this requirement would eliminate working as a hairdresser (A.R. 65).  He identified the jobs of ticket seller in a movie theatre or public transportation facility, garment sorter in a laundry, and inspector/hand packager (A.R. 65-66).  As to each of these positions, he gave the identifying DOT code and approximate number of positions available nationally and in Massachusetts (A.R. 65-66).  If the person was unable to engage in forceful grasping and twisting, the V.E. testified that the ticket seller and laundry sorter positions still would be suitable, and he added the position of bakery line worker (A.R. 66).  The V.E. testified that these

positions would still be available if the individual's ability to engage in fine manipulation was limited to frequent but less than constant (A.R. 67). Next, the ALJ asked whether, if the V.E. took into account the restrictions he had previously identified and "superimposed them on a sedentary exertional level," the V.E. could identify work such a claimant could perform. The V.E. identified the single position of security system monitor (A.R. 67). Finally, the ALJ asked whether there would be jobs for an individual who would be absent from work at least three times a month or be off task during 15% of the workday, and the V.E. testified that, in either of those cases, an individual could not work full-time (A.R. 68).

   E.   Opinion Evidence

   1. UMMC Disability Evaluation Services

   On May 9, 2017, Plaintiff was evaluated at UMMC Disability Evaluation Services by Willard Brown, D.O. (A.R. 321). Plaintiff presented with complaints of asthma, low back and hand pain, and swelling in her legs. Dr. Brown noted that Plaintiff took gabapentin, used two inhalers, had a nebulizer unit, used montelukast medication, and took buspirone (A.R. 322). Plaintiff reported that it took time and patience to take care of her personal hygiene. She did not drive and rarely left her home. On examination, Dr. Brown observed that Plaintiff had a good range of motion in her lumbar spine but had mild to moderate pain with the movements. Her grip strength was weaker than normal. Her Tinel test was positive in both hands, and she had a less than normal response to pinprick testing on the fingertips of each hand (A.R. 322). Dr. Brown's impressions were that she had asthma, chronic low back pain, and chronic bilateral wrist and hand pain, numbness, and weakness (A.R. 323).

2.   State Agency Findings and Opinions

On April 11, 2017, physician Ram Upadhyay, M.D., concluded, based on a record review, that Plaintiff was not disabled (A.R. 79).  Dr. Upadhyay found that Plaintiff had the medically determinable impairments of severe carpal tunnel syndrome, asthma, sleep-related disorders, and obesity (A.R. 75).  Rating Plaintiff's exertional limitations, he found that she could occasionally lift or carry 20 pounds, frequently lift or carry up to ten pounds, stand or walk for about 6 hours in an 8-hour workday, and sit for around 6 hours in an 8-hour workday.  As to postural limitations, he opined that she could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl (A.R. 76-77).  Dr. Upadhyay deemed Plaintiff limited to light work (A.R. 79).  He found that Plaintiff had no manipulative limitations except as to handling or gross manipulation, where she was limited in both hands because of carpal tunnel syndrome (A.R. 77).  He also found that she should avoid concentrated exposure to extreme cold, fumes, odors, gases and poor ventilation, and to hazards such as machinery or heights (A.R. 77-78).

On May 26, 2017, on reconsideration, Walter Y.K. Goo, M.D., also found, after a record review, that Plaintiff was not disabled (A.R. 91).  He agreed with Dr. Upadhyay's list of severe medical impairments, and his findings on exertional and postural limitations (A.R. 87-88).  Dr. Goo attributed additional manipulative limitations to Plaintiff, concluding that she was limited in gross handling and fingering.  He also agreed with Dr. Upadhyay's assessment of Plaintiff's environmental limitations except that he found she should avoid all exposure to fumes, odors, gases, and poor ventilation (A.R. 89).

Dr. Goo explained that Plaintiff claimed disability due to chronic asthma, swelling in her hands and feet, and bone and joint pain.  There were, however, no reports of hospitalizations or emergency room visits because of asthma.  Her obstructive sleep disorder had not resulted in

pulmonary hypertension.  Her range of motion and gait were normal notwithstanding her complaints of joint pain.  On review, therefore, Dr. Goo concluded that the records did not support a finding of disability (A.R. 89-90).

    3.  Pulmonary Medical Source Statement

Dr. Pinto-Plata completed a medical source statement on July 13, 2018.  He indicated that he had been treating Plaintiff for some eighteen months and had diagnosed her with moderate persistent asthma (A.R. 655).  He noted that she was also obese and had chronic sinusitis (A.R. 658).  Her symptoms were shortness of breath, chest tightness, wheezing, episodic acute asthma, and fatigue.  She had asthma attacks approximately every three months and was incapacitated for one to two weeks by an attack.  Emotional factors contributed to the severity of her symptoms and her functional limitations (A.R. 655).  Dr. Pinto-Plata indicated that Plaintiff would be able to stand for less than two hours in an eight-hour workday but could sit during a workday for at least six hours.  She would not need to take unscheduled breaks (A.R. 656).  Dr. Pinto-Plata opined that Plaintiff was significantly limited in her ability to lift and carry anything weighing more than ten pounds, that she had postural limitations, and that she should avoid all exposure to many environmental conditions and irritants.  He believed that she was only capable of a low stress job because stress could affect her asthma, and that she would be "off task" during approximately 15% of a typical workday, and absent from work about 3 days per month (A.R. 657-58).

    4.  Mental Impairment Questionnaire

Therapist Hansel Pantoja-Perez completed a medical impairment questionnaire dated July 13, 2018.  She indicated that she saw Plaintiff once a week and that she had diagnosed Plaintiff with depression and an anxiety disorder (A.R. 659).  The therapist indicated that Plaintiff had

decreased energy, generalized persistent anxiety, difficulty thinking and concentrating, motor

tension, and sleep disturbance.  Ms. Pantoja-Perez anticipated that Plaintiff would be absent from

work more than four days per month (A.R. 660).  In her view, Plaintiff was deeply depressed due

to her medical condition.  She believed that Plaintiff could not work because she needed to focus

on her medical treatment (A.R. 661).

     5.   Personal Care Assistance Records

     On November 7, 2017, Dr. Enriquez certified to MassHealth that Plaintiff was under her

care, had fibromyalgia, moderate persistent asthma, and obstructive sleep apnea and needed help

with activities of daily living and housework.  The letter asked that Plaintiff be assessed for her

eligibility for personal care assistance services ("PCA services") (A.R. 513).  On November 15,

2017, Dr. Enriquez signed a MassHealth form, indicating that Plaintiff was a new patient to

Riverbend and had not had a physical examination (A.R. 509).  In a follow-up letter, Dr.

Enriquez indicated that Plaintiff had an upcoming physical examination on January 18, 2018

(A.R. 514).  On or around December 5, 2017, Plaintiff was interviewed about her condition by a

nurse acting as an assessment coordinator for PCA services (A.R. 522).  According to the form,

Plaintiff's last hospital stay had been within the last 15 to 30 days (A.R. 517).  The form

reflected that Plaintiff had some difficulty with meal preparation and ordinary housework and

great difficulty with shopping and transportation.  She had difficulty dressing, taking care of her

personal hygiene, and bathing (A.R. 520).  Plaintiff reported severe daily pain at multiple

locations that disrupted her activities and did not respond adequately to medication.  She had

fallen eight times during the last ninety days and limited going outside because of her fear of

falling (A.R. 521).  Plaintiff's diagnoses included asthma, fibromyalgia, bilateral carpel tunnel

syndrome, depression, chronic sinusitis, chronic low back pain, morbid obesity, anxiety, and obstructive sleep apnea (A.R. 519-22).

Records submitted by Community Connection Healthcare, LLC ("CCH"), show that Plaintiff received assistance with activities of daily living for one or two hours a day beginning around the end of December 2017 and continuing through mid-April 2018, when CCH terminated services and referred Plaintiff to Stavros, a different provider, because Plaintiff had not fulfilled the responsibilities of the written member agreement (A.R. 528-40).

A May 31, 2018, assessment form reported that Plaintiff had some difficulty preparing meals and with transportation and great difficulty performing ordinary housework and shopping (A.R. 628, 633). Plaintiff required cueing, supervision, or some assistance with moving around her home, moving around outside of the home, dressing, and personal hygiene, including bathing (A.R. 628-29). She used a cane in the home and a walker outside of the home, although she rarely left her home (A.R. 629). Her diagnoses included morbid obesity, fibromyalgia, asthma, hypertension, and obstructive sleep apnea (A.R. 630). She experienced daily severe pain in multiple sites; medication did not adequately control the pain, and she was at risk of falling (A.R. 631). An interim care plan prepared on or around June 22, 2018, provided that she was to receive assistance with virtually all her activities of daily living, including personal hygiene and dressing, preparing meals, cleaning the home, doing laundry, shopping assistance, and assisting with or arranging transportation to medical appointments (A.R. 634).

In advance of the hearing before the ALJ, Luz Lopez, executive director of MetroCare of Springfield, LLC, reported that Plaintiff began receiving services from MetroCare in June 2018. She required supervision, cueing or physical assistance with her activities of daily living, had a caregiver who lived with her and provided up to around the clock assistance, and she received

monthly coordinating services from an RN case manager and a social work case manager (A.R. 635).

Following the hearing, the ALJ wrote to MetroCare of Springfield, LLC, asking questions about eligibility determinations for PCA services (A.R. 666-68).  On or around November 21, 2018, Ms. Luz informed the ALJ that eligibility was determined based on the contents of a physician summary form completed by a primary care physician, and that any other documentation from the primary care provider was also taken into account along with an assessment conducted by a licensed registered nurse.  Ms. Luz further informed the ALJ that, beginning in January or February 2019, the program would require that a participant's primary care physician complete a form annually for services to continue (A.R. 671).

F.  The ALJ's Decision

The ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 18, 2016, the application date (A.R. 23).  At the second step, the ALJ found that Plaintiff had the medically determined severe impairments of asthma and seasonal allergies, obstructive sleep apnea, chronic sinusitis, fibromyalgia syndrome, obesity, reactive depression, and anxiety (A.R. 23).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in Appendix 1 (A.R. 24).  To determine whether Plaintiff's depression or anxiety met or medically equaled the criteria of a listed impairment, the ALJ addressed whether the paragraph B criteria were satisfied.  He found that Plaintiff had mild limitations in her ability to understand, remember, or apply information; mild limitations in her ability to interact with others; moderate

limitations in her ability to concentrate, persist or maintain pace; and moderate limitations in her ability to adapt or manage herself (A.R. 26). He concluded, therefore, that the paragraph B criteria were not satisfied, and found that there was no evidence to establish the presence of the paragraph C criteria (A.R. 26). He further concluded that Plaintiff's mental impairments, considered singly or in combination, did not meet or medically equal the criteria in listings 12.04 (depressive disorder) or 12.06 (anxiety disorder).

Before proceeding to step four, the ALJ found that Plaintiff had the RFC:

> to perform light work as defined in 20 CFR 416.967(b) including frequently lifting ten pounds, occasionally lifting twenty pounds and sitting, standing and walking six hours during an eight-hour workday, but would be limited to no more than occasional bending, twisting or crouching, no more than occasional forceful grasp and twist motions with the upper extremities. The incumbent [sic] should be permitted to sit up to 50% of the time on task, without having to come off task to do so. The position should be indoors without concentrated exposure to dust, fumes, strong odors, temperature or humidity extremes and should accommodate seizure precautions, i.e., not to work at heights, nor around moving machinery. The environment should be low stress, not imposing strict production quotas, i.e., no more than maintenance of a reasonable pace.

(A.R. 32). Based on the V.E.'s hearing testimony, the ALJ found that Plaintiff could perform the jobs of ticket seller, laundry sorter, and bakery worker, and that these positions existed in significant numbers nationally and in Massachusetts (A.R. 34). He further found that if the claimant was only occasionally able to engage in fine manipulation and was limited to sedentary work, the person could do the job of surveillance system monitoring, a position which also existed in significant numbers nationally and in Massachusetts (A.R. 34).

IV.   <u>Analysis</u>

 1. The ALJ's treatment of opinion evidence

Plaintiff argues that the ALJ failed to accord appropriate weight to opinion evidence from

Dr. Pinto-Plata, Plaintiff's pulmonologist, her therapist Hansel Pantoja-Perez, and to documents

demonstrating that she qualified for 24-hour a day personal care assistance (Dkt. No. 20-1 at 1).

 "An ALJ must 'always consider the medical opinions in [the] case record,' 20 C.F.R. §§

404.1527(b); 416.927(b), and SSA regulations prioritize the opinions of a claimant's treating

sources. *See* 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1) (stating that '[g]enerally we give more

weight to the opinion of a source who has examined you than to the opinion of a source who has

not examined you')." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 175 (D. Mass. 2015); *see also*

*Johnson v. Colvin*, 204 F. Supp. 3d 396, 408 (D. Mass. 2016).[3]  While "controlling weight" is

generally given to a treating physician's opinion, *see, e.g., Arruda v. Barnhart*, 314 F. Supp. 2d

52, 72 (D. Mass. 2004), "[t]he law in this circuit does not require ALJs to give greater weight to

the opinions of treating physicians." *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89

(1st Cir. 1991) (citing *Tremblay v. Sec'y of Health and Human Servs.*, 676 F.2d 11, 13 (1st Cir.

1982)); *see also Arruda*, 314 F. Supp. 2d at 72.  Controlling weight is generally afforded when a

treating physician's opinion is "well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence" in the record.  20

C.F.R. § 416.927(c)(2).

> Where controlling weight is not given to a treating source opinion, the ALJ
> considers an array of factors to determine what weight to grant the opinion,
> including the length of the treatment relationship and the frequency of
> examination, the nature and extent of the treatment relationship, the degree to
> which the opinion can be supported by relevant evidence, and the consistency of

---

[3] For claims filed on or after March 27, 2017, a revised rule appearing in 20 C.F.R. § 416.920(c)
applies.  Plaintiff's claim was filed on February 10, 2017.

the opinion with the record as a whole.  *See* 20 C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6).  Further, the regulations require adjudicators to explain the weight given to a treating source opinion and the reasons supporting that decision. *See* 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

*Johnson*, 204 F. Supp. 3d at 409.  "'Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve.'"  *Id.* (quoting *Roshi v. Comm'r of Soc. Sec.*, Civil Action No. 14-10705-JGD, 2015 WL 6454798, at *6 (D. Mass. Oct. 26, 2015)). Here, the ALJ gave no "significant probative weight" to the opinion evidence from Dr. Pinto-Plata or Ms. Pantoja-Perez (A.R. 31).

The court turns first to opinions in the mental impairment questionnaire completed by Plaintiff's therapist (A.R. 659-61).  Under the regulations in effect at the time, the ALJ was not required to give "good reasons" for the weight he assigned to the opinions of Ms. Pantoja-Perez, who did not qualify as an "acceptable medical source."  *See Sutton v. Berryhill*, 358 F. Supp. 3d 162, 168 (D. Mass. 2019) (citing *Armata v. Berryhill*, No. 3:17-cv-30054-KAR, 2018 WL 4829180, at *16 (D. Mass. Oct. 4, 2018); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2)).  It was appropriate for the ALJ to reject Ms. Pantoja-Perez's opinions on the grounds that there was a "steady, significant disconnect between Plaintiff's [mental health] symptoms as described in the records," *Bourinot*, 95 F. Supp. 3d at 176, and any assessment of disability based on a mental health impairment (A.R. 31).

The same is not true with respect to Dr. Pinto-Plata, the pulmonologist who treated Plaintiff regularly and offered his opinions in the capacity of a treating physician (A.R. 655-58). *See, e.g., id.* at 175 ("SSA regulations prioritize the opinions of a claimant's treating sources," particularly treating physicians).  In addition to Plaintiff's "moderate persistent asthma," Dr. Pinto-Plata took into account Plaintiff's chronic sinusitis and obesity (A.R. 655, 658).  In the

doctor's opinion, Plaintiff's physical impairments limited her to standing for no more than 20 minutes at a time and for less than 2 hours during a workday and sitting for more than 2 hours at one time and for at least 6 hours during a workday (A.R. 656).  She would not need unscheduled breaks, could frequently lift less, and rarely lift more, than 10 pounds, could occasionally twist and climb stairs, could rarely stoop or crouch, could never climb ladders, and needed to avoid all exposure to extreme cold or heat, high humidity, and to a lengthy list of irritants (A.R. 656-57).  Finally, Dr. Pinto-Plata opined that Plaintiff's symptoms were likely to be severe enough that she would be off task for 15% of a typical workday and absent from work for about 3 days per month (A.R. 657-58).  According to the V.E., these limitations on focus and attendance would preclude a claimant's ability to work (A.R. 67-68).

The ALJ found that Plaintiff could perform light work with additional restrictions (A.R. 32, 34).[4]  Light works is defined as:

> work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b); *see also Baillargeon v. Berryhill*, 359 F. Supp. 3d 172, 180 (D.N.H. 2019).  Sedentary work is work that can be performed primarily in a sitting position and that involves lifting no more than 10 pounds at a time.  20 C.F.R. § 416.967(a); *Baillargeon*, 359 F.

---

[4] The ALJ's RFC finding was generally consistent with the findings of Drs. Upadhyay and Goo, the state agency non-examining consultants, each of whom found that Plaintiff was capable of the light work requirements for lifting, carrying, sitting, and standing, but had postural, environmental, and manipulative restrictions that limited light work opportunities (A.R. 77-80, 87-91).  The ALJ, however, disavowed reliance on these opinions on the ground that additional medical records submitted after the advising consultants had offered their opinions "require[d] modification as the new evidence more accurately reflect[ed] the current state of the claimant's physical impairments" (A.R. 30).

Supp. 3d at 180.  Dr. Pinto-Plata's opinion evidence was consistent with Plaintiff's ability to perform work that the SSA would classify as sedentary with respect to her ability to lift, carry, stand, and sit (A.R. 656-57), albeit with postural limitations and significant environmental restrictions.  His opinions about the limits on her ability to focus and her likely absences would, if accepted, disqualify her from all work.  While the ALJ did not find that Plaintiff was restricted to sedentary work, he observed that, even if she was so restricted, she could still work as a surveillance system monitor (A.R. 34).  Taking this observation into account, the ALJ still differed from Dr. Pinto-Plata in the degree to which he found that Plaintiff could tolerate such environmental conditions as dust, fumes, strong odors, and "temperature and humidity extremes," and the time she would be absent from work and off task while she was there.

The ALJ did not give "significant probative weight" to Dr. Pinto-Plata's opinions because the evidence was "solicited to accommodate" Plaintiff's SSI application; was "generally inapposite to the contemporaneous observations of the claimant" in the longitudinal history; was "particularly indicative of acceptance of subjective complaints;" was provided on a checklist with "scant analysis;" and was conjectural and dependent on speculative information as to Plaintiff's probable absences and time off task (A.R. 31).

The ALJ's refusal to give weight to Dr. Pinto-Plata's opinion because it was "solicited to accommodate this application" is legally untenable.  As a factual matter, it is incorrect.  Dr. Pinto-Plata served as Plaintiff's treating pulmonologist.  "That [his] opinion[ ] w[as] also offered to support Plaintiff's disability claim does not in any way undermine [his] status as [a] long-term *treating* clinician[ ]."  *Rivera v. Saul*, 475 F. Supp. 3d 71, 77 (D. Mass. 2020).  Moreover, "the First Circuit has made it clear for at least three decades that medical evaluations cannot be discredited simply based on their 'timing and impetus' since it is 'quite common procedure to

obtain further medical reports, after a claim is filed ….'"  *Id*. (quoting *Gonzalez Perez v. Sec'y of Health & Human Servs.*, 812 F.2d 747, 749 (1st Cir. 1987)).  *See also K.A.B. by Bilodeau v. Saul*, No. CV 18-30174-KAR, 2020 WL 488740, at *11 (D. Mass. Jan. 30, 2020) (quoting *Lobov v. Colvin*, Civil No. 12-40168-TSH, 2014 WL 3386567, at *14 (D. Mass. June 23, 2014)) ("[I]t is 'impermissible for an ALJ to disregard a treating source's opinion merely because it was solicited by the claimant's attorney.'").

Second, because the ALJ did not explain in what way Dr. Pinto-Plata's opinions were inconsistent with the longitudinal medical history, it cannot be ascertained by the reviewing court whether there are material differences between Dr. Pinto-Plata's assessment of Plaintiff's functional limitations and other providers' contemporaneous observations of her impairments and limitations.  *See Arroyo v. Barnhart*, 295 F. Supp. 2d 214, 222 (D. Mass. 2003) (finding that the ALJ's explanation that he gave little weight to the treating physician's report because it was "inapposite to the longitudinal record" was unhelpful where the ALJ's development of this reasoning was inadequate for the court's review); *contrast Shields v. Astrue*, Civil Action No. 10-10234-JGD, 2011 WL 1233105, at *8 (D. Mass. Mar. 30. 2011) (holding that the ALJ properly "supported his rejection of the treating physician's opinions with express references to specific inconsistencies between the opinions and the record").

Third, Plaintiff has been diagnosed with fibromyalgia and the ALJ found at step two that Plaintiff's fibromyalgia was a severe impairment (A.R. 23).  "[F]ibromyalgia limitations are 'of necessity based on the claimant's subjective allegations as [a] doctor's examinations of the claimant [are], with the exception of the presence of tender points, relatively benign.'"  *Tegan S. v. Saul*, C.A. No. 20-307PAS, 2021 WL 2562426, at *5 (D.R.I. June 23, 2021) (quoting *Johnson v. Astrue*, 597 F.3d 409, 412 (1st Cir. 2009) (per curiam)).  It is error for an ALJ to disregard

subjective reports in a fibromyalgia case – and, therefore, to reject expert opinion evidence because it rests on a claimant's subjective complaints – because a lack of objective findings is "what can be expected in fibromyalgia cases.'" *Johnson*, 597 F.3d at 413.

Fourth, the ALJ rejected Dr. Pinto-Plata's opinions about probable absences and time off task on the grounds that such opinions were "by definition, conjectural and dependent on subjective information" and "[w]hen coupled with no report to child protective services being called upon to investigate the claimant's ability to perform parenting duties by these mandatory reporters for such purposes," and the finding of no need for a legal guardian, representative payee or conservator, were of "little probative value" (A.R. 31).  As to the ALJ's rejection of an opinion in a fibromyalgia case because it was based on subjective information, see above. "Similarly misplaced is the ALJ's [decision to discount Dr. Pinto-Plata's opinion because the doctor] should have reported Plaintiff to [the Department of Children and Families] if he truly believed that Plaintiff was as limited as opined. … [T]here is nothing in the record which reveals what Dr. [Pinto-Plata] did or did not report to DCF or what may have gone through Dr. [Pinto-Plata's] mind at the time.  In short, the ALJ's gratuitous speculation is quintessential legal error." *Rodriguez v. Astrue*, 694 F. Supp. 2d 36, 43 (D. Mass. 2010) (citing 20 C.F.R. § 416.1453(a)).  Indeed, "the ALJ cites no legal authority to support his apparent presumption that, if a claimant is disabled for purposes of SSI, she must, by default, be incapable of caring for her children.  Such a presumption would have remarkable and inappropriate consequences for any number of SSI claimants [and their children]." *Id.* at 43 n.3.

While the ALJ could appropriately take into account that some of Dr. Pinto-Plata's opinions were provided in a checkmark format (A.R. 31), *see Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018), this is too thin a reed on which to rest a wholesale rejection of the treating

physician's opinions where the other reasons for giving the opinions no credence were legally erroneous. Where the ALJ did not articulate good reasons for declining to credit Dr. Pinto-Plata's assessments of Plaintiff's functional limitations, remand is warranted so that opinion evidence from one of Plaintiff's well-established treating physicians can be evaluated in accordance with SSA regulations and controlling case law and accorded weight based on acceptable reasons.

The ALJ treated the documents related to approval of home health aid ("HHA") for Plaintiff as an additional treating source medical opinion to which he also declined to assign any significant probative weight (A.R. 31). Here, his reasoning was twofold: (1) "[t]here is no clear listing of factors taken into consideration in recommending these HHA's [sic] and the undersigned's review of this information, and similar from other cases, indicates that such recommendations are rather freely made," and (2) are "based largely on subjective complaints" (A.R. 31).

> [The SSA is] required to evaluate all of the evidence in the case record that may have a bearing on [the SSA's] determination or decision of disability, including decisions by other governmental and nongovernmental agencies … . Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.
>
> ….
>
> Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, [the SSA is] not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than [the SSA does] for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases ….

Social Security Regulation 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). *See Dorow v. Berryhill*, 303 F. Supp. 3d 167, 170-71 (D. Mass. 2018); *Chapdelaine v. Colvin*, Civil Action No.

14-cv-30081-KAR, 2015 WL 1321480, at *1 (D. Mass. Mar. 23, 2015).  Thus, the ALJ was not required to accept the findings – explicit and implicit – in the HHA documents that Plaintiff required assistance with virtually every one of her activities of daily living.  He was required to consider and explain his reasons for rejecting the findings in those documents, as he did, and the court is required to determine whether the reasons he gave for rejecting those findings are permissible or are erroneous as a matter of law in the circumstances of the case.  *See Chapdelaine*, 2015 WL 1321480, at *2 (citing *Dube v. Astrue*, 781 F. Supp. 2d 27, 37 n.16 (D.N.H. 2011)).

The ALJ's reasons for rejecting the findings in the HHA documents do not stand up to scrutiny.  The ALJ is correct that to the extent eligibility standards differ substantively from those that govern SSA disability determinations, the persuasive value of a benefits award by other governmental and nongovernmental agencies is diminished.  The ALJ sought information from MetroCare's executive director about the medical sources on which MetroCare relied in determining whether an applicant qualified for services; whether, when services were provided, MetroCare made a determination about the length of time such services would be necessary; and whether, when MetroCare determined that such benefits were warranted, MetroCare initiated an investigation into whether the HHA benefits recipient was capable of caring for the children in his or her custody, and, if not, why no such investigation was conducted (A.R. 666-68).  MetroCare explained that it relied on an eligibility statement from the applicant's primary care physician, other documents from the provider, and an assessment conducted by a licensed registered nurse, and that HHA support was a long-term care service (A.R. 671).

The court cannot ascertain whether the ALJ is right that MetroCare has no clear standards for awarding HHA support because the ALJ did not ask MetroCare to explain its standards for

awarding benefits. *Cf., e.g., King v. Colvin*, 128 F. Supp. 3d 421, 437-38 (D. Mass. 2015)

(noting that when the record for evaluating a medical source opinion is not adequate, an ALJ

must make every reasonable effort to fill that gap) (citing *Gaeta v. Barnhart*, No. CIV.A 06-

10500-DPW, 2009 WL 2487862, at *5 (D. Mass. Aug. 13, 2009)).   The ALJ cannot properly

rely on his personal opinions and experiences in other cases as a basis for discounting the

medical opinions in the HHA documents in this case because that rationale "is not supported by

substantial evidence in the record." *Larocque v. Colvin*, Civil No. 14-cv-230-JL, 2015 WL

2342868, at *5 (D.N.H. May 14, 2015).   As to the ALJ's refusal to give weight to opinion

evidence about functional limitations based largely on subjective information from a claimant in

a fibromyalgia case, see above.

Finally, although Plaintiff had uncontrolled asthma and other impairments, "[t]his is

essentially a case about pain …." *Tegan S.*, 2021 WL 2562426, at *4.   Plaintiff testified at her

hearing that she stopped working "[b]ecause of [her] pains … [which] started getting worse and

worse.   …   [T]he pain started going through [her] whole body … and [she] used to wake up with

pain and they explained to [her] that these were all symptoms of fibromyalgia" (A.R. 50, 53-54).

Plaintiff was diagnosed with possible fibromyalgia in February 2017 and prescribed a trial of

gabapentin (A.R. 353).   In late July 2017, a primary care provider recorded fibromyalgia as a

primary diagnosis and substituted duloxetine for gabapentin, which Plaintiff reported was not

helping with her pain (A.R. 637, 639).   On or around October 31, 2017, Dr. Schumacher, a

rheumatologist, confirmed the fibromyalgia diagnosis (A.R. 335-36).   Plaintiff's testimony at the

hearing was that she was unable to engage in activities that would be required for her to perform

light or sedentary work mainly because of pain (A.R. 53-54).   The ALJ "accepted the diagnosis

of fibromyalgia, [leaving him] … '*no choice* but to conclude that the claimant suffer[ed] from

the symptoms usually associated with [such condition], unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms.'" *Johnson*, 597 F.3d at 414 (third and fourth alterations in original) (quoting *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)).

> The ALJ made the boilerplate finding that:
>
> [a]fter careful consideration of the evidence, … the claimant's medically determined impairments [including fibromyalgia] could reasonably be expected to cause the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical and other evidence for the reasons explained in this decision.

(A.R. 33).  But those reasons are not explained in the decision.  First, in this case, as in *Cano v. Saul*, Civil Action No. 1:19-cv-11563-ADB, 2020 WL 1877876, at *12 (D. Mass. Apr. 15, 2020), "[a]fter finding [Plaintiff's] fibromyalgia to be severe at step two, the ALJ did not mention fibromyalgia by name or reference Claimant's physical symptoms from that diagnosis (e.g., widespread pain) … at step three." *Id.*  Instead, he focused on listings related to Plaintiff's asthma (listing 3.03), her obstructive sleep apnea (listings 3.09 or 12.02) (A.R. 30-31), and her mental health impairments (listings 12.04 and 12.06) (A.R. 26).

In *Cano*, the court noted that "[c]ourts in this district 'differ in the extent to which at step three the ALJ must discuss whether the claimant's severe conditions medically equaled a listing,' and the First Circuit has not yet weighed in on this issue." *Id.* (quoting *Arrington v. Colvin*, 216 F. Supp. 3d 217, 233 (D. Mass. 2016), *aff'd sub nom. Arrington v. Berryhill*, No. 17-cv-01047, 2018 WL 818044 (1st Cir. Feb. 5, 2018)).  As to fibromyalgia, however, Social Security Ruling 12-2p specifically provides that, at step three, the adjudicator is required to consider whether a claimant's impairment or impairments "medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination

with at least one other medically determinable impairment."  SSR 12-2p, 2012 WL 3104869, at

*6 (July 25, 2012).  "'Where, as here, some of the evidence indicates that [claimant] may have

met a listing, the ALJ was required to actually evaluate the evidence, compare it to [the relevant

listing], and explain his conclusion.  The ALJ's failure to include such an explanation is

remandable error.'"  *Cano*, 2020 WL 1877876, at *13 (alterations in original) (quoting *Lopez*

*Davila v. Berryhill*, No. 17-cv-12212, 2018 WL 6704772, at *16 (D. Mass. Nov. 6, 2018),

*adopted sub nom. Davila v. Berryhill*, No. 17-cv-12212, 2018 WL 6499862 (D. Mass. Dec. 11,

2018)) (collecting additional cases).

Second, the ALJ failed to "'make specific findings as to the relevant evidence he

considered in determining to disbelieve the [claimant].'"  *Tegan S.*, 2021 WL 2562426, at *5

(alteration in original) (quoting *DaRosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st

Cir. 1986)).  "If objective medical evidence does not substantiate the person's statements about

the intensity, persistence, and functionally limiting effects of symptoms," an adjudicator is

required to consider all of the  evidence in the case record bearing on a claimant's allegations of

disabling pain, "including the person's daily activities, medications or other treatments the

person uses, or has used, to alleviate symptoms; the nature and frequency of the person's

attempts to obtain medical treatment for symptoms; and statements by other people about the

person's symptoms."  SSR 12-2p, 2012 WL 3104869, at *5.  The ALJ was presented with a

record showing that Plaintiff was performing very few, if any, activities of daily living; had

frequently and consistently sought treatment for pain; had been prescribed and taken gabapentin,

Cymbalta, duloxetine, and over the counter medications at various times; had – unsuccessfully –

attempted physical therapy and undergone spinal injections; and that, so far as the court can

discern, no care provider expressed doubts about the truthfulness of Plaintiff's claims of pain.

*See id.*  The ALJ was not required to accept the evidence in the record as sufficient proof of functional limitations attributable to pain that would prevent Plaintiff from performing any full-time work.  He was, however, required to address this record evidence and explain his treatment of it.  He failed to do so.  For this reason also, remand is required.

      2.      Side effects of medication

The ALJ did not err in his treatment of possible side effects from Plaintiff's medications. Plaintiff was asked about side effects from medication at the hearing and testified that the only side effect she experienced was dizziness (A.R. 58).  The ALJ accounted for this side effect in the hypothetical he posed at the hearing by specifying that the V.E. should consider seizure precautions, meaning that the V.E. should identify positions that did not require the hypothetical claimant to work at heights or around moving machinery (A.R. 32, 65).  The RFC and the ALJ's decision were consistent with the V.E.'s testimony.  There was no error.  *See, e.g., Myers v. Berryhill*, Case No. 3:18-cv-30122-KAR, 2019 WL 3976017, at *23 (D. Mass. Aug. 21, 2019) (finding that the RFC restrictions crafted by the ALJ properly accommodated any side effects of Plaintiff's medications).

      V.      <u>Conditions of Remand</u>

Plaintiff has not requested that the case be remanded to a different ALJ.  The general rule is that "it is the Commissioner who has the discretion to assign a case to a new ALJ on remand." *Simpson v. Colvin*, 2 F. Supp. 3d 81, 92 (D. Mass. 2014) (collecting cases).  In limited circumstances, however, courts have ordered the Commissioner to assign a case to a different ALJ on remand.  *See id.* (collecting cases and explaining the circumstances in which such orders have entered).  The ALJ to whom this case was assigned has disregarded judicial decisions and continued to rely on legally erroneous reasons, including the care provider's failure to report a

36

claimant to the Department of Children and Families, for declining to assign controlling weight to opinion evidence from treating physicians. *See, e.g., Rivera*, 475 F. Supp. 3d at 77; *Rodriguez*, 694 F. Supp. at 43. In fairness to this claimant, who is a single parent of three children, the court directs assignment to a different ALJ on remand.

VI.   Conclusion

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision is GRANTED, and the Commissioner's motion to affirm the decision is DENIED. Pursuant to sentence four of 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further proceedings consistent with this opinion.

It is so ordered.

Dated: December 1, 2021                      Katherine A. Robertson
                                             KATHERINE A. ROBERTSON
                                             UNITED STATES MAGISTRATE JUDGE